STATE

v.

**Sythongsay LUANGLATH et al.**

No. 94–732–C.A.

Supreme Court of Rhode Island.

March 24, 2000.

Annie Goldberg, Aaron L. Weisman, Providence, for Plaintiff.

Barbara Hurst, Paula Rosin, John A. MacFadyen, III, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

LEDERBERG, Justice.

## OPINION

This case came before the Supreme Court on appeal from a judgment of conviction in which Soukky Luanglath (Soukky) and Sythongsay Luanglath (Sythongsay) (collectively, defendants), each was found guilty of one count of burglary and three counts of robbery. In their appeal, the defendants argued that

although the trial justice determined that the victims' private investigatory activities and discussions rendered their testimony unreliable, she failed to give effect to that finding when she denied the defendants' motion for a new trial on the grounds that the verdict was against the weight of the evidence. The defendants further contended that the trial justice erred by improperly charging the jury when it became deadlocked, by denying their motion for a new trial on the grounds of newly discovered evidence, and by failing to secure from the defendants a constitutionally valid waiver of a twelve-person jury. We agree that the trial justice incorrectly applied the standard for deciding a new trial motion, and we remand this case to the trial justice for reconsideration of that motion.

### Facts and Procedural History

Sometime after 11 p.m. on Friday, March 16, 1990, three armed men invaded the home of the Souvannaleuth family in Providence, Rhode Island. The invaders terrorized family members who were present and robbed them of United States currency, gold, and jewelry with an estimated value of between $39,000 and $78,000. At least six members of the Souvannaleuth family were present in the home that night: sisters Malaythong, Southavong, and Kongseng; brother Somsamay; mother Kongkeo; and father Khamdeng.[1]

In speaking with police immediately after the incident, no member of the Souvannaleuth family could identify the assailants. Various descriptions were given to the police indicating that the assailants either were masked or were dressed in such a way that only their eyes were visible. The only identifying information given at that time to the police was by Kongseng, who believed she recognized the assailants by their voices and eyes, but she did not name them to the police.

After the incident, in the early morning hours of March 17, the Souvannaleuth family met to discuss who might have committed this crime. During the discussion, the names of Soukky and Sythongsay were mentioned. At that time or later in the weekend Kongseng showed the other family members a poster depicting a musical group of which defendants were members.

Later in the day on March 17, Mr. and Mrs. Souvannaleuth visited a restaurant, where Mrs. Souvannaleuth accused one or two men of having invaded her home the night before. Although a police officer was summoned, no arrests were made because Mrs. Souvannaleuth was unable to make a positive identification. At no time during this interaction did either Mr. or Mrs. Souvannaleuth tell police that they believed Soukky or Sythongsay had participated in the invasion of their home.

On the evening of March 17, Malaythong, Kongseng, and Southavong, with other family members, attended a party in Foxboro, Massachusetts, at which defendants' band was to perform. There was testimony that the purpose of this trip was to see how Soukky and Sythongsay would react to the family members' presence. One witness testified that "[the defendants] were acting like they committed something wrong and they got away with it."

On Monday, March 19, Kongseng brought the poster advertising defendants' band to the police station and informed the police that she believed Soukky and Sythongsay were two of the robbers. She also identified an employee of a particular gas station as the third robber. Arrest warrants immediately were issued, and all three suspects were arrested. Photographs were taken of all three suspects for use in a photo array that was viewed by four members of the Souvannaleuth family on the next day. Mrs. Souvannaleuth se-

1. Because each member of the family has the same surname, we shall refer to Malaythong, Southavong, Kongseng, and Somsamay by their first names and to their parents as Mr. or Mrs. Souvannaleuth.

lected both defendants from the nine men depicted in the photo array. Mr. Souvannaleuth and Malaythong each selected one of the two defendants. Somsamay did not select any of the photos.[2]

Before trial, both defendants moved to suppress the photo identifications. A hearing was held that focused on the procedures police used in assembling the photo array and presenting it to the witnesses. The trial justice determined that the array was neutral and that the police procedures were fair and not suggestive. On the basis of those findings, she denied the motions to suppress.

A trial was held over nine days in April and May 1993. Shortly after the jury began deliberating, the trial justice was informed that one member of the jury refused to participate. After discussion with the attorneys and defendants, the trial justice accepted defendants' waiver of a twelve-person jury, dismissed the recalcitrant juror, and instructed the jury to proceed with only eleven members. After a few hours of deliberation, the jury informed the trial justice that it was deadlocked. The trial justice gave the jurors instructions intended to encourage them to reach a verdict. Counsel for defendants immediately moved to pass the case. This motion was denied by the trial justice after the verdict was returned.

The jury returned a verdict finding each defendant guilty of one count of burglary and three counts of robbery. Counsel for defendants filed a motion for a new trial, arguing that the verdict was against the weight of the evidence. The trial justice denied the motion, explaining that she could consider only the honesty of the witnesses but not their reliability.

Two additional motions for new trial were subsequently filed. One alleged that, in finding defendants guilty, the jurors' comments indicated that they had inappropriately considered defendants' failure to

testify. The other motion for a new trial was made on the basis of allegedly new evidence. The trial justice denied both motions.

On appeal, defendants raised four issues. First, they contended that the trial justice erred in denying their first motion for a new trial because the trial justice should have taken into account her findings on the reliability of the witnesses when ruling on that motion. In addition, defendants alleged that the trial justice erred in denying their third motion for a new trial on the grounds of newly discovered evidence. Next, they argued that the trial justice's charge to the deadlocked jury was impermissibly coercive in light of the fact that the judge knew there was but one holdout juror, and consequently the charge was an abuse of discretion. Last, defendants maintained that their waiver of a twelve-person jury was constitutionally invalid.

Additional facts will be discussed as required in the legal analysis of the issues raised.

### Motion for a New Trial

■ The standard that a trial justice must apply in reviewing a motion for a new trial is well established. *State v. Dame*, 560 A.2d 330, 333 (R.I.1989); *Barbato v. Epstein*, 97 R.I. 191, 193–94, 196 A.2d 836, 837 (1964). "In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Bleau*, 668 A.2d 642, 646 (R.I.1995) (quoting *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994)). We have clearly set forth the process that a trial justice must apply when conducting this review:

"His [or her] duty is to consider in the exercise of his [or her] independent judgment all of the material evidence in the case in the light of his [or her] charge to the jury and to pass on its weight and the credibility of the wit-

---

**2.** No other family member selected the photo of the third man identified by Kongseng. She

later withdrew her identification, and charges against him were dismissed.

nesses. * * * In discharging that duty he [or she] can accept some or all of the evidence as having probative force; or he [or she] can reject some of the testimony because it is impeached or contradicted by other positive testimony or by circumstantial evidence, or because of inherent improbabilities or contradictions which alone or in connection with other circumstances satisfies him [or her] of its falsity, * * * or because it is totally at variance with undisputed physical facts or laws * * *; or he [or she] can add to the evidence by drawing proper inferences therefrom and giving weight thereto." *Barbato*, 97 R.I. at 193–94, 196 A.2d at 837.

If, after conducting this review, the trial justice finds that the evidence is balanced or that reasonable minds could differ, then the motion for a new trial must be denied. *Dame*, 560 A.2d at 333. The motion may be granted, however, "if the trial justice has reached a different conclusion from that of the jury and if it is specifically found that the verdict is against the fair preponderance of the evidence and fails to do substantial justice." *Id.* When the trial justice "has complied with the requisite procedure and articulated an adequate rationale for denying a motion for a new trial, that decision will be given great weight," *Bleau*, 668 A.2d at 646, and this Court will not disturb the decision unless the trial justice has overlooked or misconceived material evidence or was otherwise clearly wrong. *Id.*

■ We have carefully reviewed the trial justice's decision denying the motion for a new trial in the case at bar, and we are compelled to conclude that she did not comply with our established standard for considering such a motion. The trial justice appropriately began her consideration of this motion by carefully reviewing the testimony that had been presented at trial. After considering the testimony concern-

ing the family discussion after the robbery, their viewing of the poster depicting defendants' band, and the trip to Foxboro to observe the defendants' behavior, she found that

> "the risk was apparent, the risk of suggestive identification. It was apparent that the family conversed about it, and perhaps built on each other's memory of faces and voices and recognition, to the point where the Court would have to wonder and seriously question whether or not we were listening to an independent memory by the victims or whether we were listening to rehabilitated memories, built upon the family discussion the night of this terrible, terrible robbery, built upon each other's memories, enhancing their memories at Foxboro, and, of course, driving it home with a display of photos."

It is clear from these statements that the trial justice's independent review of the evidence and testimony led her to develop serious doubts as to the reliability of the eyewitness testimony that formed the basis of the state's case.[3]

Having properly begun by reviewing the evidence of the case, the trial justice then erred by determining that she could not give full effect to the findings she had made. Although she found that the state's eyewitness testimony "may not have been reliable," the trial justice also determined that "this jury saw the [s]tate's witnesses as very truth-telling people, and they did come across as people who wanted to tell the truth." In the face of this apparent conflict, the trial justice ruled "as a matter of law that it is only when the Court feels that the witnesses were not credible, that is to say, where the Court feels that witnesses were lying, that the Court can grant a motion for a new trial." It was on this basis that the trial justice denied the

**3.** The trial justice went so far as to note that had she been present during the jury deliberations, she would have attempted to guide the jury to a different conclusion by "invit[ing]

the jury to assess what may have occurred the night of the robbery, with names being thrown back and forth, the trip to Foxboro to take a look at [defendants]."

motion. Thus, the trial justice erred by not exercising her independent judgment in considering whether the verdict was against the fair preponderance of the evidence and failed to do substantial justice.

The trial justice's error in this case was predicated on her apparent belief that when she considered the credibility of witnesses, she was permitted to consider only their apparent honesty. Credibility, however, does not simply refer to veracity. Rather, credibility is more properly understood as "that quality in a witness which renders his [or her] evidence worthy of belief." Black's Law Dictionary 366 (6th ed.1990). We are perplexed by the trial justice's statement that she would have to "await guidance from the Supreme Court as to whether or not in circumstances such as we were faced with in this trial, where reliability has been undermined, that's reason enough for a trial judge to grant a motion for a new trial." Despite the trial justice's conclusion that the case law of Rhode Island left her with no guidance on how to proceed when confronted with honest but unreliable testimony, this Court has consistently held in a long line of cases that a judge ruling on a new-trial motion may reject testimony not solely because it has been shown to be deliberately false but also because in light of all circumstances, it is not worthy of belief. *See, e.g., Dame,* 560 A.2d at 333 (trial justice properly discounted testimony because it amounted to conjecture); *Beauchemin v. Sweeten,* 471 A.2d 624, 627 (R.I.1984) (trial justice appropriately rejected testimony because it was inherently improbable); *Tomasso v. DeMello,* 118 R.I. 470, 473, 374 A.2d 784, 786 (1977) (trial justice disbelieved witness because the witness was vague and unresponsive, and his testimony was implausible); *Merola v. Rotella,* 106 R.I. 735, 738, 263 A.2d 108, 110–11 (1970) (trial justice rejected testimony because it was incomprehensible); *Karem v. Harbor Shellfish, Inc.,* 99 R.I. 325, 328, 207 A.2d 384, 386 (1965) (trial justice found testimony unworthy of belief because it was contradicted by direct or circumstantial evidence); *Evan-gelista v. Antonio De Cubellis, Inc.,* 79 R.I. 142, 149, 85 A.2d 69, 72 (1951) (trial justice concluded that witnesses were more credible because their testimony was more reasonable, reliable, and probable than testimony of opposing witnesses). *See also Valente v. H.P. Hood & Sons, Inc.,* 108 R.I. 558, 562, 277 A.2d 505, 507 (1971) (question of reliability of a witness is to be considered by factfinder in determining that witness is credible).

■ Thus, the trial justice erred by considering only the witnesses' apparent veracity and not their objective reliability when she denied the motion for a new trial. The trial justice found that the witnesses appeared honest or "credible," but she indicated that their testimony was clearly unreliable because the family members' identifications did not represent the "independent memory" of the victims. Rather, the identifications were the end product of collaborative and suggestive discussions among the witnesses, resulting in memories that were "rehabilitated" and "driv[en] * * * home with a display of photos." In evaluating the credibility of the witnesses, a trial justice is not permitted to conclude that witnesses are credible if their testimony was not physically possible nor could have likely occurred. The quandary of the trial justice in this case would have been resolved had she "add[ed] to the evidence by drawing proper inferences therefrom and giving weight thereto." *Barbato,* 97 R.I. at 193–94, 196 A.2d at 837.

Because the trial justice did not properly exercise her independent judgment in considering the new trial motion, her denial of a new trial will not be afforded deference. Therefore, we are remanding this case to the trial justice for reconsideration of the motion for a new trial inasmuch as "it is the trial justice who has [had] the opportunity to observe the witnesses as they testify and therefore is in a better position to weigh the evidence and to pass upon the credibility of the witnesses than

is this [C]ourt," *Lembo v. Lembo,* 677 A.2d 414, 417 (R.I.1996). In ruling on the motion, the trial justice must exercise her independent judgment in evaluating the reliability of the witnesses. The trial justice must also determine to what extent reliability affects the witnesses' credibility and what weight should be given to their testimony. Additionally, the trial justice must make a finding on whether the verdict was against the weight of the evidence.

Because we are remanding this case to the trial justice for reconsideration of the defendants' possibly dispositive new-trial motion, we refrain at this time from addressing the defendants' other issues on appeal.

### Conclusion

The defendants' appeal is sustained in part. We remand this case to the Superior Court for reconsideration of the defendants' motion for a new trial in accordance with this opinion. Accordingly, the papers of the case may be returned to the Superior Court.